# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

WILLIAM BRIDGE, individually and on
behalf of all others similarly situated,

    Plaintiff,

v.

CREDIT ONE FINANCIAL, a Nevada
Corporation, d/b/a CREDIT ONE
BANK, N.A.,

    Defendant.

Case No. 2:14-cv-1512-LDG (NJK)

**ORDER**

In his Amended Complaint, William Bridge alleges that Credit One violated the
Telephone Consumer Protection Act when, without his prior express consent, it used an
auto-dialer to place calls to his cellular telephone number from around January to March
2014.

On January 18, 2014, Bridge used his cell phone to contact Credit One regarding his
mother's account. He alleges he did so without her knowledge or consent, that he talked
with a Credit One representative, and that he advised that he was making the call in
relation to his mother's account. Credit One counters that its records establish that Bridge
called its Automated Account Information number, but used his mother's account

1  information to access its systems. In either event, Bridge alleges and Credit One does not

2  dispute that it captured his cell phone number and associated that number with his

3  mother's account. When his mother's account became delinquent, Credit One began

4  calling Bridge's cell phone.

5      Credit One moves to stay (ECF No. 109) and compel arbitration (ECF No. 110)

6  arguing that, because Bridge used his mother's account information to contact Credit One,

7  he should be bound by the arbitration clause in the Cardholder Agreement his mother

8  signed. Alternatively, Credit One moves to strike the class claims (ECF No. 111) and

9  disqualify Bridge as a class representative (ECF No. 112), arguing that Bridge's conduct

10 not only establishes that his claim is highly unique but that he is an improper class

11 representative. Credit One also asks that Bridge's Nevada Deceptive Trade Practices Act

12 claim be dismissed (ECF No. 113). Bridge opposes each motion.

13     Bridge has moved to certify a class, appoint a class representative, and appoint

14 class counsel (ECF No. 150). Credit One opposes the motion.[1]

15 Background

16     Bridge's mother was a Credit One account holder. Credit One's standard

17 Visa/MasterCard Cardholder Agreement, Disclosure Statement and Arbitration Agreement

18 ("cardholder agreement") provides the following:

19     COMMUNICATIONS: You are providing express written permission
       authorizing Credit One Bank or its agents to contact you at any phone
20     number (including mobile, cellular/wireless, or similar devices) or email
       address you provide at anytime, for any lawful purpose. . . . Phone numbers
21     and email addresses you provide include those you give to us, those from
       which you contact us or which we obtain through other means.
22
   The Cardholder Agreement also contains the following arbitration provision:
23

24
   _____

25     [1]     Credit One has also moved to strike (ECF No. 177) the Jeremy Mapes'
   Supplemental Declaration, Paragraphs 6-9 of the Declaration of Kyle McGee, and Exhibits
26 B, F, G, L, and M to the Declaration of Adam Levitt. The Court will deny the motion.

> Claims subject to arbitration include not only Claims made directly by you, but also Claims made by anyone connected with you or claiming through you, such as a co-applicant or authorized user of your account, your agent, representative or heirs, or a trustee in bankruptcy.

The cardholder agreement's arbitration provision further states:

> Claims subject to arbitration include, but are not limited to, disputes relating to the establishment, terms, treatment, operation, handling, limitations on or termination of your account; any disclosures or other documents or communications relating to your account; any transactions or attempted transactions involving your account, whether authorized or not: billing, billing errors, credit reporting, the posting of transactions, payment or credits, or collections matters relating to your account.

In January 2014, Bridge's mother underwent surgery and Bridge learned that her prognosis was not favorable. In addition to the emotional impact of his mother's condition on Bridge, he was also concerned that he had no understanding of his mother's finances in the event that she passed away. Bridge stayed in his mother's house while she was in the hospital. During that time, he discovered a folder in which his mother kept her bills. On January 18, 2014, Bridge called his mother's creditors using the toll-free numbers he found on her bills. He made the calls from her home, using his mobile phone, while she was in the hospital. He did not discuss making these calls with his mother, received neither her consent nor her instruction to do so, and did so without her knowledge.

Credit One's toll-free number connects its customers to its "Automated Account Information" system. According to Credit One's records, Bridge reached its IVR technology which allows customers to interact with its systems using a telephone keypad. The records further establish that Bridge performed a "Full" IVR authentication of his mother's account. That is, in response to an automated message requesting the customer to "enter your sixteen digit card number," Bridge entered his mother's account number that he found on her billing statement. Next, in response to an automated message that the customer "enter the last four digits of your social security number," Bridge entered the last four digits of his mother's social security number. Bridge then received an automated instruction to "[p]lease stay on the line while we access your account." As Bridge had entered the

3

1 validation information for his mother's account, he was able to access information related
2 to his mother's account, including the account balance, delinquency status, and payment
3 due dates.

4 Upon successful authentication of the account and partial social security
5 information, Credit One associated the phone number Bridge had used to contact it with his
6 mother's account. Bridge's mother's account became delinquent, and Credit One made
7 calls to Bridge's mobile phone to recover the debt. Bridge alleges that over 100 such calls
8 were made to his mobile phone number between January 2014 and March 2014. On or
9 about March 18, 2014, Bridge instructed a Credit One representative to stop calling his cell
10 phone, and no subsequent calls were made.

11 Analysis - Nevada Deceptive Trade Practices Act Claim

12 Credit One's motion to dismiss the NDTPA claim, brought pursuant to Fed. R. Civ.
13 P. 12(b)(6), challenges whether Bridge's complaint states "a claim upon which relief can be
14 granted." In ruling upon this motion, the court is governed by the relaxed requirement of
15 Rule 8(a)(2) that the complaint need contain only "a short and plain statement of the claim
16 showing that the pleader is entitled to relief." As summarized by the Supreme Court, a
17 plaintiff must allege sufficient factual matter, accepted as true, "to state a claim to relief that
18 is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), *Landers*
19 *v. Quality Communications, Inc.*, 771 F.3d 638, 641 (9th Cir. 2015). Nevertheless, while a
20 complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the
21 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a
22 formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at
23 555, *Landers*, 771 F.3d at 642. In deciding whether the factual allegations state a claim,
24 the court accepts those allegations as true, as "Rule 12(b)(6) does not countenance . . .
25 dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke v.*
26 *Williams*, 490 U.S. 319, 327 (1989). Further, the court "construe[s] the pleadings in the

4

1  light most favorable to the nonmoving party." *Outdoor Media Group, Inc. v. City of*
2  *Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007).

3      However, bare, conclusory allegations, including legal allegations couched as
4  factual, are not entitled to be assumed to be true. *Twombly*, 550 U.S. at 555, *Landers*, 771
5  F.3d at 641. "[T]he tenet that a court must accept as true all of the allegations contained in
6  a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678
7  (2009). "While legal conclusions can provide the framework of a complaint, they must be
8  supported by factual allegations." *Id.* at 679. Thus, this court considers the conclusory
9  statements in a complaint pursuant to their factual context.

10      To be plausible on its face, a claim must be more than merely possible or
11  conceivable. "[W]here the well-pleaded facts do not permit the court to infer more than the
12  mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the
13  pleader is entitled to relief." *Id.* (citing Fed. R. Civ. P. 8(a)(2)). Rather, the factual
14  allegations must push the claim "across the line from conceivable to plausible." *Twombly*,
15  550 U.S. at 570. Thus, allegations that are consistent with a claim, but that are more likely
16  explained by lawful behavior, do not plausibly establish a claim. *Id.* at 567.

17      As relevant to Bridge's NDTPA claim, "[a] person engages in a "deceptive trade
18  practice" when in the course of his or her business or occupation he or she knowingly: . . .
19  3. Violates a state or federal statute or regulation relating to the sale or lease of goods or
20  services." Nev. Rev. Stat. 598.0923(3). Bridge argues that the TCPA is such a "statute,"
21  as 47 U.S.C. §227(a)(4) defines "telephone solicitation" as meaning "the initiation of a
22  telephone call or message for the purpose of encouraging the purchase or rental of, or
23  investment in, property, goods, or services, which is transmitted to any person, but such
24  term does not include a call or message (A) to any person with that person's prior express
25  invitation or permission, (B) to any person with whom the caller has an established
26  business relationship, or (C) by a tax exempt nonprofit organization." Bridge fails, however,

5

1    to identify any allegation of his Amended Complaint suggesting that Credit One violated a
2    statute within the TCPA relevant to the Act's regulation of telephone solicitations. Rather,
3    he alleges that Credit One violated 47 U.S.C. §227(b)(1)(A)(iii) of the TCPA, which
4    prohibits a person from making "any call (other than a call made for emergency purposes
5    or made with the prior express consent of the called party) using any automatic telephone
6    dialing system or an artificial or prerecorded voice– . . . (iii) to any telephone number
7    assigned to a . . . cellular telephone service." Further, Bridge has alleged that Credit One's
8    calls concerned attempts to collect a debt which, for purposes of the NDTPA, does not
9    constitute doing business. *See* Nev. Rev. Stat. 80.015(1)(h). Dismissal of Bridge's NDTPA
10   claim is appropriate.

11   Analysis - Motion to Compel Arbitration

12        In its motion to compel arbitration, Credit One asserts that Bridge should be bound
13   by the cardholder agreement including the arbitration provision even though he is a non-
14   signatory to the agreement. Credit One argues that non-signatories may be bound by
15   arbitration agreements under ordinary contract and agency principles. Alternatively, It
16   argues that estoppel precludes Bridge from avoiding the arbitration clause. Bridge argues
17   that the cardholder agreement does not apply to him under any legal theory.

18        In determining whether parties have agreed to arbitrate a dispute, the court applies
19   general state-law principles of contract interpretation, while giving due regard to the federal
20   policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor
21   of arbitration. *Mundi v. Union Security Life Ins. Co.*, 555 F.3d 1042, 1044 (9th Cir. 2009)
22   (citations omitted). The presumption in favor of arbitration, however, does not apply if
23   contractual language is plain that arbitration of a particular controversy is not within the
24   scope of the arbitration provision. *Id.*, (citations omitted).

25        In some circumstances, a non-signatory to an arbitration agreement may be bound
26   by the agreement. *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006). Federal

courts have identified five theories pursuant to which an arbitration clause can be enforced by or against a non-signatory: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil piercing alter ego, and (5) estoppel. *Id.* However, "[t]he strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement." *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1287 (9th Cir. 2009) (quoting *Buckner v. Tamarin*, 119 Cal. Rptr. 2d 489 (Cal. App. 2002)).

Credit One's argument that agency principles bind Bridge to the arbitration provision is without merit. "Where Nevada law is lacking, its courts have looked to the law of other jurisdictions, particularly California, for guidance." *Eichacker v. Paul Revere Life Ins. Co.*, 354 F.3d 1142, 1145 (9th Cir.2004) (quotation omitted). "Under California law, when a non-signatory and one of the parties to an arbitration agreement have an agency relationship, the arbitration agreement may be enforced against the non-signatory." *Tamsco Properties, LLC v. Langemeier*, 597 F. App'x 428, 429 (9th Cir. 2015). The court in *Tamsco* relied, in part, on *Nguyen v. Tran*, 157 Cal. App. 4th 1032, 68 Cal. Rptr. 3d 906 (2007). In *Nguyen,* the court noted that an arbitration agreement may be enforced by or against a non-signatory "when a non-signatory and one of the parties to the agreement have a preexisting agency relationship that makes it equitable to impose the duty to arbitrate on either of them." 157 Cal. App. 4th at 1036–37. In that case, the court found that the non-signatory who was identified in the underlying agreement as an agent of the signatory could, as the agent of the signatory, enforce the arbitration agreement against another signatory.

The Court in *Tamsco* also cited *Berman v. Dean Witter & Co.*, 44 Cal. App. 3d 999, 1003, 119 Cal. Rptr. 130, 133 (Ct. App. 1975). In *Berman*, the plaintiff purchased futures contracts on his wife's account with a securities broker, then brought a suit arising from that purchase. The broker and its agent sought to enforce the arbitration provision in the agreement establishing the wife's account. Neither the plaintiff nor the broker's agent were

signatories to the agreement. Nevertheless, the court noted that the dispute arose out of and was related to the agreement. As such, the broker's agent (a non-signatory) was entitled to the benefit of the arbitration provision to the same extent as his principal (a signatory). Conversely, the plaintiff (a non-signatory) was "not entitled to any greater right than his principal (a signatory). Under the agreement, the broker could enforce the arbitration provision against the wife, and the agent of the broker could likewise enforce the agreement against the plaintiff–the agent of the wife.

In the present matter, Credit One has not shown that Bridge was acting as an agent for his mother at the time she entered the Cardholder Agreement. Further, Bridge was not identified as an agent for his mother in the Cardholder Agreement. Accordingly, the arbitration provision cannot be enforced against Bridge on the basis that he had a pre-existing agency relationship with his mother at the time Credit One and Bridge's mother agreed to arbitrate disputes, and whose claims arise from or concern the Cardholder Agreement.

Even assuming Bridge acted as his mother's agent at the time he called Credit One using his mother's account information, such act of agency is insufficient to compel arbitration against Bridge. Credit One is "not entitled to any greater right" against Bridge than those rights to which it is entitled as against his mother, who is the principal and signatory. Pursuant to the Cardholder Agreement, a Credit One customer agrees to arbitrate claims arising from communications relating to her account. The customer also agrees that she is "providing express written permission authorizing Credit One Bank . . . to contact [her] at any phone number (including mobile, cellular/wireless, or similar devices) . . . [she] provide[d] at anytime . . . includ[ing] those from which [she] contact[ed Credit One.]"

Pursuant to the TCPA, however, a customer cannot give Credit One express written permission to use a regulated device to contact her at a cell phone number for which the

8

customer is neither the subscriber nor the customary user. More particularly, she could not give Credit One such permission by the mere act of contacting Credit One using a phone for which she was neither subscriber nor customary user. If Credit One used a regulated device to call a mobile phone number used by a customer to contact Credit One, and the customer was neither the subscriber nor customary user of that number (and did not otherwise have any authority to grant permission regarding that number), Credit One's calls to that number would be outside the terms of, and not governed by, the Cardholder Agreement and not subject to its arbitration provision. Credit One cannot merely rely on a customer's use of a mobile phone to contact Credit One, and the terms of the Cardholder Agreement, to establish that the customer could and did grant consent to Credit One to make calls to that particular phone. Conversely, the terms of the Cardholder Agreement and a customer's use of a cell phone to contact Credit One do not establish that Credit One's subsequent calls to that cell phone number are governed by the Cardholder Agreement. Rather, in the context of the TCPA, Credit One must show (in addition to the terms of the Cardholder Agreement, and the customer's use of a phone) that the customer could, for the mobile phone number used to contact Credit One, grant consent to Credit One to call that mobile phone number. As Credit One has neither argued nor shown that Bridge's mother could grant it permission to use a regulated device to contact Bridge's phone, the Court cannot conclude that Bridge, as her agent, could grant that permission. Accordingly, Credit One cannot compel Bridge, in his capacity as an agent of his mother, to arbitrate his TCPA claim.

Whether Bridge should be equitably estopped from avoiding the arbitration provision, however, presents a closer and more difficult question. "Equitable estoppel 'precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes.'" *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (quoting *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267 (5th

1  Cir.2004)). "[N]onsignatories have been held to arbitration clauses where the nonsignatory
2  'knowingly exploits the agreement containing the arbitration clause despite having never
3  signed the agreement.'" *Id.*, (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc*
4  *Fiber & Resin Intermediates*, 269 F.3d 187, 199 (3d Cir.2001)). In *Comer*, the Ninth Circuit
5  affirmed the district court's denial of the defendant's motion to compel arbitration. The
6  court noted that the plaintiff was "simply a participant" in an ERISA plan, did not seek to
7  enforce the terms of the underlying agreement, and did not otherwise take advantage of
8  the agreements.

9      In Nevada, the elements of equitable estoppel are: "(1) the party to be estopped
10  must be apprised of the true facts, (2) that party must intend that his conduct shall be acted
11  upon or must so act that the party asserting estoppel has the right to believe it was so
12  intended, (3) the party asserting estoppel must be ignorant of the true state of the facts,
13  and (4) the party asserting estoppel must have detrimentally relied on the other party's
14  conduct." *Las Vegas Convention and Visitors Authority v. Miller*, 124 Nev. 669, 698, 191
15  P.3d 1138, 1157 (2008); *see also Holland Livestock Ranch v. U.S.*, 655 F.2d 1002 (9th Cir.
16  1981).

17      "A non-signatory to an arbitration agreement may be compelled to arbitrate where
18  the non-signatory 'knowingly exploits' the benefits of the agreement and receives benefits
19  flowing directly from the agreement. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179
20  (9th Cir. 2014) (citing *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268
21  F.3d 58, 61 (2d Cir.2001)). In *Nguyen*, the Ninth Circuit indicated the plaintiff was "not the
22  type of non-signatory contemplated by the rule." *Id.* It went on to note that "[e]quitable
23  estoppel typically applies to third parties who benefit from an agreement made between
24  two primary parties." *Id.* The plaintiff brought suit against an online retailer. The plaintiff
25  relied on the Terms of Use's "choice of law provision in his complaint and asserting class
26  claims under New York law." *Id.*, at 1179. The retailer's website had a link to its Terms of

10

Use, but the plaintiff neither read nor clicked on the link to the Terms of Use. The plaintiff did use the website in an unsuccessful attempt to purchase a product from the retailer. On this evidence, the court determined that the plaintiff was "not equitably estopped from avoiding arbitration because he relied on the Terms of Use's choice of law provision."

In *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001), the Second Circuit explained that "[t]he benefits must be direct-which is to say, flowing directly from the agreement." The court went on to explain:

> *Deloitte [Noraudit A/S v. Deloitte Haskins & Sells*, U.S., 9 F.3d 1060, 1064 (2d Cir.1993)], for example, concerned an agreement containing an arbitration clause which governed the terms of use of a trade name. A non-signatory who had received a copy of the agreement, raised no objections to it and made use of that trade name pursuant to the agreement was estopped from arguing it was not bound by the arbitration clause in the agreement. *Deloitte,* 9 F.3d at 1064.
>
> By contrast, the benefit derived from an agreement is indirect where the non-signatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself. *Thomson-CSF, [S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir.1995)]. In *Thomson-CSF*, for example, two companies agreed to trade exclusively with each other. *Id.* at 775. A third-party competitor acquired one of the companies, apparently with the intent of squeezing the remaining company out of the market. *Id.* The unacquired signatory was contractually bound to trade only with a company that was now a subsidiary to its competitor. *Id.* Thus, interest in trading waned. *Id.* While the agreement was crucial to the benefit the third party gained by shutting its competitor out of the market, the agreement was not the direct source of the benefit. *Id.* at 778-79. Rather, the benefit flowed from the non-signatory's exploitation of the contractual relation created through the agreement by acquiring one of the signatories to the agreement.

268 F.3d at 61–62.

Bridge quotes, in his opposition, the Texas Supreme Court in *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739–40 (Tex. 2005) for the proposition that if "a non-signatory's claims can stand independently of the underlying contract, then arbitration generally should not be compelled under this theory." As suggested by the court's discussion in that matter, a suit brought to enforce the terms of a contract is an obvious example of a non-signatory seeking a direct benefit–a benefit flowing directly from the

contract. *Deloitte*, however, provides an example of direct benefit estoppel applying to a non-signatory who argued that its claim did not arise from the agreement containing the arbitration provision. The court concluded, however, that the non-signatory's acceptance of the benefits of the agreement, as well as its knowledge of and failure to object to the agreement, estopped it from denying its obligation to arbitrate under the agreement.

Bridge argues that "even if *none* of the terms of the Cardholder Agreement existed, [he] would still have a viable TCPA claim against Credit One." The argument is accurate only to the extent that the elements of his TCPA claim do not rely upon any term within the Cardholder Agreement. The argument ignores, however, the allegations of his own amended complaint, in which he acknowledges that he first contacted Credit One in relation to his mother's account. The issue raised by Credit One's motion is whether Bridge should be permitted to engage in and benefit from conduct governed by the Cardholder Agreement, which conduct elicited Credit One's response that is the subject of his TCPA claim, but avoid its arbitration provision.

The Court disagrees with Bridge's argument that this case is more like *Bridas S.A.P.I.C. v. Gov't. of Turkmenistan*, 345 F.3d 347 (5th Cir. 2003) than *Hellenic Investment Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514 (5th Cir. 2006). Both matters are distinguishable. Bridge is accurate in noting that, in *Bridas*, the non-signatory did not sue the signatory based upon the underlying agreement. He ignores, however, that *Bridas* involved a signatory initiating an arbitration proceeding against the non-signatory to pursue a claim against the non-signatory under the provisions of the underlying agreement. The present matter concerns a non-signatory bringing a claim against the signatory. At issue is whether that suit against the signatory is "premised in part upon the agreement." *Bridas*, 345 F.3d at 362.

The matter underlying *Hellenic* is similar to the present matter in that it involved a signatory seeking to enforce an arbitration provision against a non-signatory who had

12

brought suit against the signatory. The claim in *Hellenic*, however, depended on establishing that the signatory had acted contrary to other provisions of the same document containing the arbitration provision. In the present matter, the claim does not rest upon the terms of the Agreement, but the provisions of the TCPA.

Bridge does not cite to any authority that the benefit to the non-signatory must be pecuniary. While benefits are often, or even typically, pecuniary is insufficient to establish that the benefit must be pecuniary. Bridge's assertion that he did nothing with the knowledge he gained from calling Credit One does not negate that he received the knowledge. For a customer of Credit One, gaining authorized access to the Credit One system to obtain information regarding the status of an account would be a direct benefit flowing from the Cardholder Agreement. Bridge's unauthorized access resulted in him also receiving the same direct benefit, though based upon his mother's Cardholder Agreement.

In sum, the Court finds that Bridge was aware of the true facts regarding his access of the Credit One system. He knew he was not a Credit One cardholder and could not have gained authorized access to the Credit One system as an account holder. Bridge discovered his mother was a Credit One account holder when he discovered her bill, which contained both her account number and a toll-free number to contact Credit One. Bridge accessed the Credit One system. He was asked to input his account number. He responded by inputting his mother's account number. He was asked to input the last four numbers of his social security number. He responded by inputting the last four digits of mother's social security number.

Bridge engaged in this conduct for the purpose of obtaining information regarding the status of his mother's Credit One account. He called Credit One, provided his mother's account information, because he intended to have Credit One provide him with information regarding his mother's account.

13

1    Bridge alleges in his complaint that he informed a Credit One representative that he
2    was calling "in relation to his mother's account," and not any account held by him. Credit
3    One has submitted evidence showing that Bridge accessed an automated system and
4    responded to prompts requiring a caller to authenticate that the caller was accessing the
5    caller's account. As Bridge responded by performing a full authentication for his mother's
6    account, Credit One could not have known that the person calling from Bridge's phone was
7    not his mother. Credit One relied upon Bridge's conduct by treating him as the cardholder
8    and providing him with account information.

9        The elements of Bridge's TCPA claim do not, however, require that he establish
10   Credit One breached a term of the Cardholder Agreement. Rather, his TCPA claim rests
11   upon Credit One's conduct that was elicited by and in response to Bridge's unauthorized
12   access of the Credit One system. Although Bridge obtained a direct benefit flowing from
13   his conduct, which conduct would be governed by the Cardholder Agreement for a Credit
14   One cardholder, the Court concludes that, under the circumstances of this case, Bridge
15   should not be equitably estopped from denying that his claim is subject to the arbitration
16   provision.

17   Analysis - Class Certification[2]

18       "Federal Rule of Civil Procedure 23 governs the maintenance of class actions in
19   federal court. Parties seeking class certification must satisfy each of the four requirements
20   of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and at least one of the
21   requirements of Rule 23(b)." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th
22   Cir. 2017). The prerequisites to establishing a class are as follows:

23

24   _____

25       [2]    As Credit One's Motion to Strike Class Claims rests upon its argument that
     Bridge cannot serve as a class representative, which is one factor the Court must consider
26   in deciding Bridge's motion to certify the class, the Court will deny the motion to strike as
     moot.

14

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>(1) the class is so numerous that joinder of all members is impracticable;
>(2) there are questions of law or fact common to the class;
>(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>(4) the representative parties will fairly and adequately protect the interests of the class."

Fed. R. Civ. P. 23(a). Bridge seeks certification of a class pursuant to Rule 23(b)(3), which permits a class to be maintained if the prerequisites of Rule 23(a) are satisfied and:

>(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>>(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>>(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

"[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161, 102 S. Ct. 2364, 2372, 72 L. Ed. 2d 740 (1982)).

Bridge proposes the following definition for the class: all "persons and entities:

(a) within the United States;

(b) that, at any time between September 17, 2012 and the date of trial, Credit One (or its agents) transmitted at least two non-emergency telephone calls;

(c) from any device capable of automated or predictive dialing;

(d) to his/her cellular telephone;

15

1      (e)    where Credit One's records indicate that at least one such call was a
2                   "wrong number" call, as evidenced by either:

(e) where Credit One's records indicate that at least one such call was a "wrong number" call, as evidenced by either:

     (1) a "wrong number" disposition in Credit One's Contact or Attempts records, or

     (2) a "block/DNC ever" disposition in Credit One's Contact or Attempts records, plus the appearance of any term in the Keyword List 11 in Credit One's Account Notes records;

(f) where Credit One's records further indicate that the last telephonic communication between the person or entity and Credit One (whether on an inbound or an outbound call) was dispositioned as "wrong number" or "block/DNC ever";

(g) where the cellular telephone number called remains assigned to the subscriber of that number at the time of the calls; and

(h) that cellular telephone subscriber was not, at the time of the calls, a current Credit One account holder.

A.  Numerosity

"The prerequisite of numerosity is discharged if 'the class is so large that joinder of all members is impracticable.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998) (quoting Fed.R.Civ.P. 23(a)(1)). Bridge notes that the "precise number" of class members is not presently known, but that even the small sample of Credit One's call data shows hundreds of potential members. Credit One gathered and provided Bridge with its records relevant to a sample of 500 telephone numbers. Bridge's expert determined that 300 of the telephone numbers were identified as cellular telephone numbers. Counsel for Bridge asserts that, of the 300 cellular telephone numbers, 265 numbers satisfied conditions (a) through (f) of Bridge's proposed class definition. Bridge acknowledges that some of the remaining 265 cellular telephone numbers will not satisfy conditions (g) or (h). Bridge argues, and Credit One does not dispute, that the initial number of all telephone numbers that would undergo this process exceeds 1.5 million. Even considered conservatively, Bridge's proposed class will have hundreds of thousands of members.

Credit One has not argued that the potential number of members of the class fails to meet the numerosity prerequisite. Rather, Credit One argues that Bridge is seeking to

16

1  certify a class that is "unprecedented . . . in size."  While the size of the class may be
2  unprecedented, Bridge has met his burden of showing that the proposed class is
3  sufficiently large to render joinder of all members impracticable.

4  B.    Commonality

5       "[C]ommonality [is] the rule requiring a plaintiff to show that "there are questions of
6  law or fact common to the class."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349, 131
7  S. Ct. 2541, 2550-51, 180 L. Ed. 2d 374 (2011) (citing Rule 23(a)(2)).  "'What matters to
8  class certification . . . is not the raising of common 'questions'—even in droves—but, rather
9  the capacity of a classwide proceeding to generate common answers apt to drive the
10 resolution of the litigation.  Dissimilarities within the proposed class are what have the
11 potential to impede the generation of common answers.'"  *Id.*, (quoting Nagareda, *Class*
12 *Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.Rev. 97, 132 (2009)).  As explained
13 by the Supreme Court, the claims of the class members "must depend upon a common
14 contention—for example, the assertion of discriminatory bias on the part of the same
15 supervisor. That common contention, moreover, must be of such a nature that it is capable
16 of classwide resolution—which means that determination of its truth or falsity will resolve an
17 issue that is central to the validity of each one of the claims in one stroke."  *Id.*, at 350.

18      In his motion to certify, Bridge argues that "[t]he common questions raised by the
19 Class' claims include: (1) whether Credit One's and its agents' dialing systems constitute
20 ATDSs under the TCPA; (2) whether debt collection calls constitute "emergency calls"
21 under the TCPA; (3) whether Credit One acted negligently or knowingly and willfully in
22 placing the calls . . . ."[3]

23

24
       ─────────────────
25       [3]     Bridge also asserts a fourth common question: "whether Credit One's conduct
       violates the Nevada Deceptive Trade Practices Act's ("NDTPA") prohibition on unlawful
26     practices."  In light of the dismissal of Bridge's NDTPA claim, this question is no longer
       relevant to his motion to certify a class.

Credit One does not offer any argument that the second question—whether debt collection calls constitute emergency calls—is not common to the proposed class nor that it is not central to a determination of the TCPA claim. Neither does Credit One offer any argument that, assuming liability is established, Bridge's third question—whether Credit One acted negligently or knowingly and willfully—is not a question that will be capable of classwide resolution.

Credit One does argue, however, that Bridge's first question—whether Credit One's dialing systems constitute ATDSs—is actually multiple questions none of which are common to the class. Credit One notes that the sample of 500 telephone numbers called by Credit One demonstrates that calls to numbers were initiated by various third-party vendors. Credit One also offers the declaration of Aaron Anderson, Credit One's Senior Vice President of Collections Strategy & Operations. Anderson identifies eight third-party vendors that were authorized to place calls on behalf of Credit One. Credit One further argues that each of these vendors may have used different systems at different times during the proposed class period. Credit One points out that the calls placed to Bridge's cell phone were placed by two different vendors.

In his reply, Bridge initially references Credit One's dialing systems in the plural ("Plaintiff must prove at trial that Credit One's dialing systems qualify as automatic telephone dialing systems"), but refers to the result in the singular ("If Plaintiff cannot do that, then Credit One will not be liable to any Class member"). Bridge then argues that "the answer to the question whether each [dialing system] qualifies as an "ATDS" will not vary with the identity or circumstances of any given Class member." The argument appears to suggest that Bridge acknowledges that his proposed common "question" actually consists of multiple similar, but distinct, questions, each of which will need to be resolved. The argument also fails because the questions will vary according to the identity or circumstances of any given class member.

18

1      Bridge, himself, exemplifies that the "question" is not a single question common to
2 all class members, but multiple questions that, while similar, will not only be different for
3 different class members but might also be different for different calls made to each class
4 member. Credit One has shown that the calls to Bridge were placed by two different
5 vendors. Assuming that each vendor used just one dialing system, Bridge will be required
6 to show that one of the vendors used restricted technology to establish liability for the calls
7 placed by that vendor. Although the answer to this question will not "vary" when
8 considering whether the other vendor that called Bridge used an ATDS, the answer will
9 also be irrelevant. For the calls placed by the other vendor, Bridge will be required to
10 establish that the other vendor also used restricted technology. If Bridge shows one
11 vendor used an ATDS, but fails to show the other vendor used an ATDS, Credit One's
12 liability will be limited to only those calls placed by the vendor using restricted technology.
13 Accordingly, the question–whether Credit One's dialing systems constitute ATDSs–is not a
14 question common to the class. Bridge has only established that the common questions
15 are: whether debt collection calls are non-emergency, and (assuming liability) whether
16 Credit One acted negligently or knowingly and willfully toward the class.

17 C.    Typicality

18      Pursuant to Rule 23(a)(3), "the claims or defenses of the representative parties
19 [must be] typical of the claims or defenses of the class." "The test of typicality 'is whether
20 other members have the same or similar injury, whether the action is based on conduct
21 which is not unique to the named plaintiffs, and whether other class members have been
22 injured by the same course of conduct.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508
23 (9th Cir.1992) (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D.Cal.1985)). "'Typicality
24 refers to the nature of the claim or defense of the class representative, and not to the
25 specific facts from which it arose or the relief sought.'" *Id.* (quoting *Weinberger v. Thornton*,
26 114 F.R.D. 599, 603 (S.D.Cal.1986)). However, "a named plaintiff's motion for class

1  certification should not be granted if 'there is a danger that absent class members will
2  suffer if their representative is preoccupied with defenses unique to it.'" *Id*, (quoting *Gary*
3  *Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180
4  (2d Cir.1990)).

5       After careful consideration, the Court concludes that Bridge is atypical of the class,
6  because of the danger that litigation of the TCPA claim will become preoccupied with
7  defenses and issues unique to Bridge. As previously discussed in this order, a significant
8  issue has already been raised regarding the manner by which Bridge accessed Credit
9  One's system. In his Amended Complaint, Bridge alleged he received calls from Credit
10 One from January through March 2014. He alleged, on information and belief, that Credit
11 One was attempting to reach his mother, who had a credit card account with Credit One.
12 He alleged that he accessed Credit One's system on January 18, 2014, when he called
13 Credit One's number, talking with a live representative, and representing that he was
14 calling in relation to his mother's account.

15      In his original complaint, however, Bridge alleged Credit One began calling him in
16 the fall of 2013, and obtained his number through "means unknown to him." He alleged a
17 belief that his son (with a similar name) had an account with Credit One, and obtained the
18 number through skip tracing or some other method of obtaining information through a third
19 party.

20      As Bridge acknowledges, through discovery he became aware that the calls
21 occurred in January through March 2014, and that Credit One obtained his cellular phone
22 number when he called them. After he became aware of this discovery, he recalled that he
23 had called Credit One, and had done so in relation to his mother's account. In his
24 deposition, he recalled that he became aware of his mother's Credit One account while
25 staying in her house (while she was hospitalized), and finding his mother's bill from Credit
26 One in a folder. He obtained Credit One's number from that bill. Consistent with the

allegations of his Amended Complaint, Bridge testified that he used that number, without his mother's consent or knowledge, to call Credit One.

Credit One has proffered evidence that is inconsistent with the allegations of Bridge's complaint, particularly regarding his first phone call to Credit One. That evidence indicates that Bridge did not speak with a live representative, but instead accessed Credit One's automated system. Credit One's system requires the caller to authenticate his or her account status in order to access the system. Bridge did not provide his own account information (as he was not an account holder) nor a portion of his own social security number. Rather, contrary to the instructions of the Credit One system, he provided the account information and partial social security number of a Credit One account holder–his mother. Credit One has also shown evidence that account holders have agreed that Credit One can contact them at telephone numbers used by the account holder to contact Credit One.

The Court has prev8ouly concluded that these facts are not sufficient to require Bridge, as a non-signatory to the Cardholder Agreement, to arbitrate his claims. However, neither this conclusion, nor Bridge's assertions that these facts are irrelevant, establish that these facts are irrelevant to this litigation. Rather, Bridge's conduct, including his admitted unauthorized contact with Credit One, and the disputed issues whether he gained unauthorized access to Credit One's automated system for its account holders, raises a significant danger that this litigation will focus on issues and defenses unique to Bridge. Accordingly, the Court cannot agree that Bridge's litigation of his TCPA claim would be typical of the proposed class.

D.    Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class

1  members and (2) will the named plaintiffs and their counsel prosecute the action vigorously
2  on behalf of the class?" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).
3  Bridge asserts that he and his counsel do not have any conflicts with other class members,
4  and will vigorously prosecute this action.

5     Credit One contends that Bridge and his counsel will not adequately represent the
6  class because (a) Bridge initially defined a class of which he was not a member,
7  "jettison[ed] . . . the bulk" of that class in defining a new class of which he was a member,
8  (b) proposes the certification of a class that will require significant resources merely to
9  differentiate between members and non-members, and (c) counsel has requested that this
10  court enjoin other actions. None of these arguments are sufficient, either standing alone or
11  considered cumulatively, to show that Bridge and his counsel have a conflict with other
12  class members or would not prosecute this action vigorously.

13     While Bridge has met his burden as to the prerequisites of numerosity, commonality,
14  and adequacy of representation, he has not met his burden as to the prerequisite of
15  typicality. Accordingly, certification of the proposed class is not appropriate.
16  E.     Rule 23(b)(3)

17     Bridge seeks to certify the class pursuant to Rule 23(b)(3).[4] Pursuant to Rule
18  23(b)(3), "[a] class action may be maintained . . . if the court finds that questions of law or
19  fact common to class members predominate over any questions affecting only individual
20  members, and that a class action is superior to other available methods for fairly and
21  efficiently adjudicating the controversy." In making this determination, the Court may
22  consider "the likely difficulties in managing a class action." *Rule 23(b)(3)(D)*.

23
24

25     [4]  While the Court has concluded that certification is not appropriate because
26  Bridge has not shown typicality, the Court will address whether certification would be
    proper under Rule 23(b)(3) in the interest of judicial economy.

1  Initially, the Court must note a significant difficulty in managing a class action that
2  arises from the questions Bridge has identified as common to the class and his proposed
3  class definition. Bridge has, in large part, defined the proposed class according to the
4  language and elements of a TCPA claim. For example, Bridge identifies, as one of the
5  questions common to the class, whether debt collection calls constitute "emergency calls"
6  under the TCPA. Accepting this as a "common question," Bridge's proposed class is a fail-
7  safe class because the second proposed characteristic of the class is that Credit One
8  transmitted at least two non-emergency calls to potential class members. "The fail-safe
9  appellation is simply a way of labeling the obvious problems that exist when the class itself
10  is defined in a way that precludes membership unless the liability of the defendant is
11  established. When the class is so defined, once it is determined that a person, who is a
12  possible class member, cannot prevail against the defendant, that member drops out of the
13  class. That is palpably unfair to the defendant, and is also unmanageable-for example, to
14  whom should the class notice be sent?" *Kamar v. RadioShack Corp.*, 375 F. App'x 734,
15  736 (9th Cir. 2010).

16  Bridge cannot both (a) define the class as comprised of members to whom Credit
17  One transmitted two non-emergency calls, and (b) seek class-wide resolution whether the
18  debt collection calls transmitted by Credit One were non-emergency calls. As suggested in
19  *Kamar*, "to whom should the class notice be sent?" Accepting Bridge's assertion that a
20  question exists whether a debt collection call constitutes a non-emergency call, the Court
21  cannot identify any person to whom to send a class notice without *first* determining that a
22  debt collection call is a non-emergency call. If the Court makes this determination and
23  identifies the class members, the question is no longer a question common to be resolved
24  on a class-wide basis. If the Court does not reach the merits of this question, no member
25  of the proposed class can be identified.

26

1    Bridge appears to recognize this problem. Despite his proposed language defining
2    the class, he argues that members of the class can be identified as those entities and
3    persons to whom Credit One transmitted at least two calls. More specifically, he argues
4    that, starting from a database of all calls placed by Credit One, an automated data sorting
5    process can be applied to the database to create a sub-set of only "telephone numbers
6    that received two or more calls from Credit One or its agents." Accordingly, given that
7    Bridge has asserted that a question common to the class is whether debt collection calls
8    are emergency calls, his proposed class characteristic that "Credit One (or its agents)
9    transmitted at least two non-emergency telephone calls" to the member renders the class
10   unmanageable as a fail-safe class.

11   Similarly, Bridge has asserted, as a common question, whether Credit One's and its
12   agents' dialing systems constitute ATDSs under the TCPA. Assuming this question was
13   common to the entire class,[5] the proposed class is fail-safe because the third characteristic
14   of the class is that the calls to each member were transmitted "from any device capable of
15   automated or predictive dialing." Again, Bridge cannot both (a) define the class as
16   comprised of members to whom Credit One transmitted calls from an ATDS, and (b) seek
17   class-wide resolution whether Credit One transmitted the calls from an ATDS. The Court
18   cannot identify members to whom to send notice without first resolving the merits of the
19   proposed common question: whether Credit One's dialing systems constitute ATDSs.

20   Bridge asserts, in his motion, that the question whether Credit One's dialing systems
21   constitute restricted technologies does not need to be resolved for purposes of identifying
22   class members. The Court disagrees. He has proposed a class in which each class
23   member shares the characteristic of having been contacted by Credit One using restricted
24   technology. Until the Court establishes that Credit One used restricted technology to

25

26   [5]     As indicated previously, however, it is the finding of this Court that the
         question is not common to the proposed class.

24

1  transmit calls, it cannot identify any person or entity to whom Credit One transmitted a call
2  using restricted technology.

3      Bridge's argument that the question whether Credit One used a restricted
4  technology can be resolved later also appears to concede this defect in his proposed class
5  definition. In his motion, he does not argue that the Court should identify class members
6  as those receiving a call from restricted technology, but those receiving a call through a
7  dialing system (rather than a manual dialing of a number). He again argues this
8  identification can be achieved by eliminating, from the database of calls placed by Credit
9  One, those numbers to whom Credit One did not transmit at least two calls initiated with a
10  dialing system. Accordingly, as Bridge argues that the question whether Credit One used
11  an ATDS to make the calls is common to the class, the proposed class characteristic that
12  Credit One made the calls "from any device capable of automated or predictive dialing"
13  renders the class fail-safe and unmanageable.

14      It appears to the Court, however, that Bridge could likely cure these defects. For
15  example, while he proposes that the class include those who received two non-emergency
16  calls, he suggests that potential members of the class would be identified as those persons
17  or entities as to whom Credit One transmitted at least two calls using a dialing system.
18  Accordingly, to the extent that the Court denies certification on this basis, it is without
19  prejudice.

20      The Court finds, however, that the last four proposed class characteristics establish
21  that individual issues will predominate, rendering the proposed class unmanageable, and
22  that this cannot be cured merely by redefining the class. Characteristics (e) and (f) concern
23  whether Credit One's records attach a "wrong number" or similar report to a cell phone
24  number. (The Court will refer to these as the "wrong number" characteristics).
25  Characteristic (g) limits the class to those members who were the subscribers to the
26  relevant phone number at the time of the calls and who remain the subscriber of that

25

1  mobile phone number. Characteristic (h) limits the class to subscribers who were not
2  Credit One account holders at the time Credit One called them. The arguments of the
3  parties reveal that these characteristics are relevant to the issue of consent.

4      Unlike Bridge's proposed "non-emergency call" and "ATDS" characteristics, the lack
5  of consent characteristics are not stated in the language of a TCPA claim. Further, Bridge
6  has not argued that consent is a "common question" that must be resolved relevant to
7  these characteristics. Rather, Bridge urges that "the conditions of Class membership, to be
8  implemented in the Class member identification process, nullify the question of consent by
9  excluding from the Class any persons or entities that may have provided Credit One with
10 prior express consent to be auto-dialed. Thus, here, the question of consent can be
11 resolved on evidence and theories applicable to the entire class." Opening Brief, at 25.
12 Bridge goes on to argue that, to the extent Credit One can identify individual examples
13 where a wrong number incorrectly indicates a lack of consent, it cannot show a sufficient
14 number that would predominate over the common questions, and that the Court can
15 manage any necessary individualized inquiries.

16     Pointing to Bridge's arguments regarding the "wrong number" and "lack of consent"
17 characteristics, Credit One argues that Bridge is seeking to create a fail-safe class.
18 Specifically, Credit One argues Bridge has admitted creating a fail-safe class in his
19 assertions that "[t]he cumulative effect of all of the conditions is to reduce to zero, or near
20 zero, the probability that a person meeting each of the conditions would also have provided
21 prior express consent," Opening Brief at 7, and "[w]hile these restrictions diminish the size
22 of the Class, they demolish any likelihood that persons who consented to receive
23 auto-dialed calls are swept into it" *Id.*, at 4.

24     The Court disagrees with Credit One that the "wrong number" characteristics create
25 a fail-safe class that cannot be certified. Unlike the non-emergency number and ATDS
26 characteristics, the Court does not need to reach the merits of the question of consent to

1   identify those telephone numbers for which Credit One noted "wrong number" on its

2   records, for which the subscriber at the time of the calls currently remains the subscriber,

3   and for which the subscriber is not an account holder.

4        The Court does agree with Credit One, however, that individual issues of consent

5   predominate and render the class action an inferior method to fairly and efficiently

6   adjudicate the TCPA claims of the proposed members. Despite Bridge's assertions to the

7   contrary, the lack-of-consent characteristics do not nullify or reduce to zero the question of

8   consent. Courts that have certified a class action TCPA claim have generally determined

9   that the issue of consent could be resolved on a class-wide basis. Unlike Bridge, the

10  plaintiff in *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1306 (D. Nev. 2014)

11  identified "whether the class members expressly consented to receive the text messages"

12  as a common issue that would generate a common answer applicable class-wide. In that

13  case, the defendants alleged that the phone numbers were obtained when class members

14  visited one of hundreds of different websites. While the defendants offered the testimony

15  of officers of defendants, the court noted neither had personal knowledge whether any

16  class member had provided consent. Accordingly, in the absence of any evidence of

17  consent, the court determined that "a review of these entities' procedures as to obtaining

18  consent should produce a common answer." *Id.*, at 1307. The court further noted,

19  however, that if the defendants developed proof of consent that would require burdensome,

20  individualized inquiries, the court could take remedial measures that could include

21  decertification.

22       In *Taylor v. Universal Auto Grp. I, Inc.*, No. 3:13-CV-05245-KLS, 2014 WL 6654270,

23  at *16 (W.D. Wash. Nov. 24, 2014), the court held that "the predominant issue of prior

24  express consent is subject to generalized proof on a classwide basis" under the

25  circumstances of that case. The defendants–the "new" Tacoma Dodge

26  dealership–obtained all of the telephone numbers as part of an asset purchase and sale

27

agreement from the "old" Tacoma Dodge dealership. The old dealership had, in turn, obtained all of the numbers "as part of its regular practice of obtaining customer information." *Id.* Further, the court noted that the TCPA claim concerned a single "welcome" text message from the "new" dealership to customers of the "old" dealership. As such, the issue of consent would be determined with respect to a single call and a single method of acquiring the mobile phone numbers.

In *Stern v. DoCircle, Inc.*, No. SACV 12-2005 AG JPRX, 2014 WL 486262, at *8 (C.D. Cal. Jan. 29, 2014), the court noted that "TCPA cases are neither uniformly suitable or unsuitable for class action treatment. Whether the predominance requirement is satisfied depends on the unique issues and evidence presented in the case." The court went on to note that, at the stage of the litigation when it was considering the motion to certify, the defendant had presented evidence of consent that applied to the class and the plaintiff had presented little evidence relevant to consent. As such, the court concluded, "it appears that consent will be proved or disproved on evidence and theories applicable to the entire class." *Id.* The court also noted that it could revisit the issue if individualized inquiries into consent "threaten[ed] to swamp common questions." *Id.*

By contrast, courts have denied certification of a class in a TCPA claim because the determinative question concerning consent could not be resolved on a class-wide basis, but was instead subject to individualized inquiries. In *Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 329 (5th Cir. 2008), the Fifth Circuit held "that [the plaintiff] ha[d] failed to advance any viable theory employing generalized proof concerning the lack of consent with respect to the class involved in this case [which] . . . leads to the conclusion that myriad mini-trials cannot be avoided . . . ." In that case, the defendant proffered evidence that it had obtained the telephone numbers from various purchased databases as well as other sources, including information submitted by merchants through the defendant's website, from information submitted at trade shows, and from lists of companies with which the

28

defendant had an established business relationship. In short, "the evidence show[ed] that the recipients' fax numbers were collected over time and from a variety of sources . . . ." As such, "individual inquiries of the recipients [were] necessary to sort out which transmission was consented to and which was not."

Relying on *Gene and Gene*, the court in *Connelly v. Hilton Grand Vacations Co.*, LLC, 294 F.R.D. 574 (S.D. Cal. 2013) denied certification of a TCPA claim. The Court noted that the manner in which the defendant obtained telephone numbers came from a variety of sources over time. Further, at issue was whether consent had occurred "under the circumstances of the individualized experience that each guest shared with [the defendant]." *Id.*, at 578.

This matter is distinguished from those cases in which the calling party used a common method to obtain the numbers of all called parties. At issue was whether, as a part of that method, the calling party obtained consent from all called parties. The relevant circumstances were such that a determination could be made whether *all* recipients of the calls or texts had consented or had not consented. The present case, however, arises from Credit One's attempts to make debt collection calls to the phone numbers of its account holders, from whom Credit One had obtained consent to call the account holder at phone numbers provided by the account holder. Bridge's claim rests upon the premise that Credit One failed to ensure that these debt collection phone calls were only being made to its account holders. Rather, some debt collection calls were made to wrong numbers; that is, the call was actually directed at the phone number of a person who was not an account holder and thus had not consented to receive debt collection calls from Credit One. In short, Credit One was calling both consenting and non-consenting parties.

Bridge argues that "persons who may have consented to receive auto-dialed calls are eliminated from the Class definition," and that "the Class definition is structured to ensure lack-of-consent is an issue common to the Class as a whole . . . ." The Court

29

1 disagrees because Bridge has not structured the class to distinguish between account
2 holders and non-account holders. Bridge recognizes that a call recipient's status as an
3 account holder is relevant to the issue of consent as he attempts to limit the class to
4 account holders. However, limitation is only applied to *subscribers* of the phone number.
5 As a result, the proposed class distinguishes between subscribers who are account holders
6 and subscribers who are not, and ignores that the latter category includes customary users
7 of a mobile phone number who are account holders (and thus have given consent).

8    Bridge incorrectly argues that the customary user issue "is a red herring because the
9 TCPA protects the cell phone subscriber." As noted by the FCC, however, "the TCPA
10 requires the consent not of the intended recipient of a call, but of the current subscriber (*or*
11 *non-subscriber customary user of the phone*)." In re Rules & Regs. Implementing the Tel.
12 Cons. Prot. Act of 1991, 30 F.C.C.R. 7961 (2015) (emphasis added). Regardless of
13 whether the TCPA protects the subscriber, such protection is limited to the extent that a
14 caller can obtain consent to call a mobile phone number from a non-subscriber customary
15 user of that phone number.

16    The present case establishes that some of Credit One's account holders are
17 customary users of a phone for which the subscriber is not an account holder. Bridge's
18 mother was an account holder. She was also the customary user of the mobile phone
19 number for which Bridge was the subscriber. Bridge's mother could give Credit One
20 consent to call the mobile phone number she customarily used even though Bridge, the
21 subscriber, had not given consent. Characteristics (e) and (f) do not eliminate, from the
22 potential class, subscribers of mobile phone numbers for which a customary user was a
23 Credit One account holder. As a result, an individual inquiry will be necessary for each
24 subscriber of a phone number to determine whether there was a customary user of that
25 number and whether the customary user is an account holder.

26

In addition, the proposed class definition does not exclude subscribers of mobile phone numbers for which the customary user may have changed since the time of Credit One's calls to that number. Bridge's proposed structure of his class recognizes that the reassignment of a mobile phone number raises individual issues that are relevant to consent. To eliminate the need for individual inquiry resulting from reassignment, he proposes that the class be limited to those subscribers at the time of the calls who remain as the current subscriber. He suggests that this can be determined from publicly available databases. This "lack of reassignment" characteristic eliminates issues of consent caused by the reassignment of a phone number to a new subscriber. It does not, however, eliminate the necessity of conducting an individual inquiry whether the customary user at the time of Credit One's calls remains a current customary user. Any change of customary users subsequent to the first call being placed to a mobile phone number will be relevant to determining consent. Unlike reassignments between subscribers, however, changes in the customary users of a mobile phone number are not recorded in a publicly accessible database against which the phone numbers can be reviewed for such a change. This further establishes that determining consent will require an individual inquiry for each subscriber of a mobile phone number.

Bridge notes, in his motion for certification, that he modified his original proposed class definition to ensure that false "wrong number" reports would not be captured in the class. As Bridge concedes, he did so because "reported 'wrong number' calls may have been lawful." The modification proposed by Bridge was to require that a "wrong number" report be attached to Credit One's records for the last communication between Credit One and a mobile phone number. Bridge's concession and argument in support of the modification rests upon the recognition that Credit One's records establish that a "wrong number" report can be false; that is, a "wrong number" report in a Credit One record does not, by itself, establish lack of consent. The Court will not speculate as to the specific

1  reasons a "wrong number" record might falsely show lack of consent. However, Bridge's

2  additional "last communication" condition of class membership does not exclude any false

3  "wrong number" records from being captured in the class that would not otherwise be

4  excluded. As noted by Bridge in his reply, his proposed class structure already excludes

5  subscribers who are account holders. Pursuant to this condition, the call records of

6  subscribers who are account holders, including call records with a false "wrong number"

7  report, will not be captured in the class. However, this condition will not exclude a false

8  "wrong number" report when the subscriber is not an account holder but a customary user

9  is an account holder. The Court finds that the necessity of an individual inquiry to

10  determine consent is further established by Credit One's records that some of its "wrong

11  number" reports are inaccurate, particularly as the evidence establishes that some account

12  holders are customary users who cannot otherwise be identified on a class-wide basis.

13        The Court finds that, just as a subscriber's status as an account holder is relevant to

14  determining consent, a customary user's status as an account holder is also relevant to

15  determining consent. Limiting the class to subscribers who are not account holders does

16  not eliminate the necessity of determining whether the phone number was customarily

17  used by a Credit One account holder (assuming that consent could be determined solely

18  on the basis of account holder status at the time of the calls). Further, Bridge's own

19  Amended Complaint and testimony establish that an individual inquiry will be required for

20  each mobile phone number to determine whether an account holder was the customary

21  user of the number.

22        The need for individual inquiry becomes more acute given that Bridge has not

23  sought to certify a class to litigate the issue whether Credit One violated the TCPA by

24  making one call, or even a limited group of calls, to all class members. Rather, litigation of

25  this matter will also require consideration of consent of both subscribers and customary

26  users as to millions of calls spanning multiple years that were initiated under a variety of

circumstances. Just as Credit One's records establish some "wrong number" reports are false, the records establish that lack of consent at the time of one call will not necessarily reflect lack of consent at the time of a different call. Accordingly, the Court finds that individual inquiries regarding consent will predominate over the common questions that can be litigated on a class-wide basis.

Finally, while Bridge has described the process that he would employ to identify potential class members, the likely difficulties in administering that process would preclude, or at a minimum provisionally limit, certification of the proposed class at this time. Bridge's proposed method of identifying class members rests upon a premise to which he devotes little attention in his opening brief and, despite Credit One's arguments in opposition, largely ignores in his reply. Specifically, Bridge asserts that either he or a neutral third-party will conduct a series of automated queries on "Credit One's call records and account holder demographic data . . . ." Opening Brief, at 5.

Credit One notes, in opposition, that it has 350 million call records relevant to the 3.5 million phone numbers (as of July 2015) to which Credit One attached a "wrong number" or similar disposition. These records, however, do not exist in a single database, but across several different systems. Further, its systems are not structured to readily provide this information in a form usable for the purposes and process intended by Bridge. Credit One has offered evidence that it required 85 work-hours just to compile, from its various systems, the sample of 500 numbers it provided to Bridge during discovery. Further, once in possession of the 500-number sample, Bridge's own efforts required significant time and, Credit One argues, considerable additional individual consideration. That process, however, suggested that most of the records produced by Credit One will not concern potential class members, but will concern all calls to Credit One cardholders, including calls placed on landlines and manually dialed calls. Credit One argues that Bridge neither moved to compel disclosure of this material nor could he successfully move to compel

33

1  disclosure of these records.  Credit One also notes that the evidence submitted by Bridge
2  to support his assertion that this process can be applied to Credit One's records does not
3  show that the process can be successfully applied to the entire set of records sought by
4  Bridge from Credit One.

5       Bridge responds that he was not required to move to compel the records during the
6  initial discovery process, which was limited to discovery relevant to certification.  Rather, he
7  asserts he will move to compel disclosure of these records subsequent to certification if
8  Credit One refuses to produce the records.  Given the extent of records that Bridge would
9  be moving to compel Credit One to create and produce, and given that it is likely more than
10  half of the created and produced records would concern non-members of the class, an
11  issue exists whether Bridge would succeed on a motion to compel the records.  Even if
12  Bridge could define a class as to which his claims were typical and the consent of the class
13  members could be determined on a class-wide basis, the Court would be required to limit
14  any certification as provisional and conditioned upon (a) Bridge successfully compelling
15  Credit One to create and produce the necessary records from which Bridge could identify
16  class members, and (b) Bridge establishing that he could successfully implement his
17  proposed process to identify class members on the full set of records that Credit One
18  would create and produce.

19       Therefore, for good cause shown,

20       THE COURT **ORDERS** that Credit One's Motion to Compel Arbitration (ECF No.
21  110) is DENIED;

22       THE COURT FURTHER **ORDERS** that Credit One's Motion to Stay (ECF No. 109)
23  is DENIED as moot;

24       THE COURT FURTHER **ORDERS** that Credit One's Motion to Dismiss (ECF No.
25  113) William Bridge's Nevada Deceptive Trade Practices Act claim is GRANTED;

26

1  THE COURT FURTHER **ORDERS** that Credit One's Motion to Strike (ECF No. 177)
2  is DENIED;

3  THE COURT FURTHER **ORDERS** that William Bridge's Motion to Certify Class,
4  Appoint a Class Representative, and Appoint Class Counsel (#150) is DENIED with
5  prejudice;

6  THE COURT FURTHER **ORDERS** Credit One's Motion to Strike Class Claims (ECF
7  No. 111) and Motion to Disqualify William Bridge as a Class Representative (ECF No. 112)
8  are DENIED as moot.

9

10  DATED this ___23rd__ day of February, 2018.

11

12  _____
   Lloyd D. George
13  United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26